IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JESS LEVENTHAL, et al. | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | NO. 18-2727 |
| | : | |
| THE MANDMARBLESTONE GROUP LLC, et al. | : | |
| Defendant | : | |

**MEMORANDUM OPINION**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                         November 24, 2020

## I. INTRODUCTION

Presently before the Court is Plaintiffs' Jess Leventhal, The Leventhal Sutton & Gornstein 401(k) Profit Sharing Plan, and the Leventhal Sutton & Gorstein law firm (collectively "Plaintiff") motion to compel various discovery responses by Defendants The MandMarblestone Group ("MMG") and Nationwide Trust Company ("Nationwide"). As the facts of this case are well known to the parties, we present here only those facts relevant to the current motion.

Plaintiff first raised the issues contained in this motion in its more expansive March 27, 2019 motion to compel discovery. (Doc. 31.) On July 1, 2019, the District Court denied that motion to compel "as premature pursuant to Federal Rule of Civil Procedure 16." (Doc. 48.) A Rule 16 conference was held on August 24, 2020. (Doc. 64.) On September 7, 2020, Plaintiff moved to compel discovery on issues salient to this opinion. (Doc. 66.) On September 18, 2020, the District Court Judge referred resolution of this discovery dispute to us. (Doc. 70.) We then ordered counsel to meet and confer to narrow their discovery disputes and to submit a joint letter to the Court identifying the remaining issues and the parties' positions with respect to each.

1

(Doc. 71.) The parties repeatedly failed to submit a *joint* status letter as directed and rather submitted separate letters outlining their positions. (Doc. 78; Doc. 79.) It is apparent from these reports that two issues remain in dispute between Plaintiff and MMG, and six issues remain in dispute between Plaintiff and Nationwide. We resolve these issues as set out in our order and supported by this memorandum opinion.

## II. LEGAL STANDARD

Generally, all relevant, non-privileged information is discoverable. Fed. R. Civ. P. 26(b)(1). Information need not be admissible to be discoverable.[1] *Id.* Rather, it must merely be "relevant to any party's claims or defenses and proportional to the needs of the case." *Id.* "Relevance in this context has been 'construed broadly to encompass any matter that could bear on, or that could reasonably lead to other matter that could bear on any issue that is or may be in the case.'" *United States v. Abbott Labs.*, 2016 WL 4247429, at \*2 (E.D. Pa. Aug. 11, 2016) (quoting *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 351 (1978)). "The scope of discovery is very broad, though it 'is not unlimited and may be circumscribed.'" *ITOCHU Int'l, Inc. v. Devon Robotics, LLC*, 303 F.R.D. 229, 231 (E.D. Pa. 2014) (quoting *Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 191 (3d Cir. 1999)). "It is axiomatic that a trial court has broad discretion to fashion discovery orders." *Kuhns v. City of Allentown*, 264 F.R.D. 223, 227 (E.D. Pa. 2010). In fashioning such an order, we are mindful that the Third Circuit favors a policy of liberal discovery standards. *See, e.g.*, *Westchester Fire Ins. Co. v. Household Int'l, Inc.*, 167 F. App'x 895, 899 (3d Cir. 2006).

---

[1] We note that the 2015 Amendment to the Federal Rules of Civil Procedure deleted from Rule 26(b)(1) the provision stating that discovery of relevant but inadmissible information must be "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26, 2015 Amendment. The amendment to the Rules states that this change was made because "the phrase has been used by some, incorrectly, to define the scope of discovery." *Id.* The amendment makes it clear that "[d]iscovery of nonprivileged information not admissible in evidence remains available so long as it is otherwise within the scope of discovery." *Id.*

Federal Rule of Civil Procedure 33 allows the parties to serve written interrogatories on any other party. Fed. R. Civ. P. 33(a)(1). "Each interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath." *Id.* (b)(3). Under certain circumstances, a party may answer an interrogatory through production of business records:

> If the answer to an interrogatory may be determined by examining . . . a party's business records (including electronically stored information), *and if the burden of deriving or ascertaining the answer will be substantially the same for either party*, the responding party may answer by . . . specifying the records that must be reviewed, *in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could*.

*Id.* (d)(1) (emphasis added). Where a party fails to answer an interrogatory or provides an evasive or incomplete answer, the interrogating party may bring a motion to compel a sufficient answer. Fed. R. Civ. P. 37(a)(3)(b). The party resisting production bears the burden of persuasion and "'must show specifically' how the information requested 'is not relevant or how each question is overly broad, burdensome, or oppressive.'" *In re Auto. Refinishing Paint Antitrust Litig.*, No. MDL 1426, 2006 WL 1479819, at *2 (E.D. Pa. May 26, 2006) (quoting *Josephs v. Harris Corp.*, 677 F.2d 985, 992 (3d Cir. 1982)).

Federal Rule of Civil Procedure 36 allows the parties to "serve on any other party a written request to admit . . . the truth of any matters within the scope of Rule 26(b)(1)." Fed. R. Civ. P. 36(a)(1). In a Rule 36 request, "the statement of fact itself should be in simple and concise terms in order that it can be denied or admitted with an absolute minimum of explanation or qualification." *United Coal Cos. v. Powell Constr. Co.*, 839 F.2d 958, 967 (3d Cir. 1988). "If a matter is not admitted, the answer must specifically deny it or state in detail why the answering party cannot truthfully admit or deny it." Fed. R. Civ. P. 36(a)(4). After receiving a response, "[t]he requesting party may move to determine the sufficiency of an answer or objection." *Id.* (a)(6). "Answers that appear to be non-specific, evasive, [or] ambiguous . . . are impermissible

and must be amended." *Guinan v. A.I. duPont Hosp. for Children*, 2008 WL 938874, at *1 (E.D. Pa. Apr. 7, 2008) (citation omitted).

## III. DISCUSSION

Our discussion is organized in two sections: First, disputes between Plaintiff and MMG, and second, disputes between Plaintiff and Nationwide. Within those sections, we address each "topic" of dispute, and then discretely analyze the specific interrogatory or RFA at issue within each topic. This format is consistent with the parties' presentation of the issues to the Court. *See* Doc. 78; Doc. 79.

### A. Plaintiff and MMG

#### 1. MMG's Anti-Fraud Measures: RFA No. 10

Plaintiff's RFA No. 10 to MMG stated the following: "Admit that MMG did not implement any of the foregoing anti-fraud measures in connection with its processing of the Four Fraudulent Withdrawal Forms." (Doc. 76, Ex. 1 at 5.) Neither party has specifically identified what they characterize as "anti-fraud measures." However, examples set out in the immediately preceding RFA include: "User IDs, passwords and/or verified bank accounts." MMG's response to RFA stated, in relevant part:

> It is admitted that MMG's responsibilities and role in the withdrawal process (after receiving the signed withdrawal request form from Plaintiffs through, but not after, transmittal of the withdrawal request form to Nationwide) did not require USER IDs, passwords, or verified bank accounts, however, MMG abided by protocols common during the Relevant Transaction Period and/or the protocols and procedures required by Nationwide for purposes of successfully processing a withdrawal request, if any. The remainder of this request is denied . . . ."

(*Id.*)

Plaintiff argues that MMG's response only expresses "its legal opinion that it was not *required* to implement [the anti-fraud] measures," and that "MMG did not answer the factual

question of whether or not such measures were *actually* implemented." (Doc. 78 at 9) (emphasis in original).

MMG argues that its answer "responds directly to the question asked on the facts" and also "denied that the specific protocols inquired about were legally required at the relevant time." (*Id.*) MMG explained that its response thus "admits that MMG's role in the 401(k) withdrawal process did not require (i.e., did not include or involve) 'User IDs, passwords, or verified bank accounts,'" but that MMG did "abide[] by protocols common during the Relevant Transaction Period." (*Id.*)

We agree with Plaintiff's assessment that MMG's response failed to address the central factual inquiry presented in the RFA. MMG's answer expressed only whether it was *required* to implement anti-fraud measures. This answer is not responsive to the factual question of whether the anti-fraud measures were *actually* implemented. MMG must amend its answer to respond to the precise question presented.

### 2. The Identification of Originating IP Addresses on Certain Emails: RFA No. 3

Plaintiff's RFA No. 3 to MMG stated the following:

> Admit that the Originating IP addresses . . . associated with the emails that transmitted the Four Fraudulent Withdrawal Forms to MMG (and the related back-and-forth emails surrounding some of those withdrawals) are different from the Originating IP address . . . associated with legitimate withdrawals such as the ones dated on or about January 7, 2016, March 2, 2016, and April 8, 2016.

(Doc. 76, Ex. 1 at 15.)

In response, MMG denied the request. MMG stated that: "The 'Originating IP' address information provided on Plaintiff's spreadsheet is unreliable and potentially misleading. Based on its lay understanding of IT matters, MMG cannot confirm any conclusion(s) that Plaintiffs attempt to draw from those IP numbers." (*Id.*) MMG concluded its response by stating: "[I]t is

MMG's understanding that drawing conclusions from IP addresses in the metadata, without additional information and/or expert forensic analysis, carries a high risk of being speculative, unreliable, and/or wrong. Hence, this request is denied." (*Id.*)

Plaintiff argues that MMG's response was "evasive" and that it "did not fairly respond to the substance of the matter." (Doc. 78 at 10.) Plaintiff contends that its RFA presented "a factual question" and that "instead of providing a factual answer, MMG expressed a slew of technical opinions regarding the 'reliability' an analyzing IP addresses generally to reach 'conclusions.'" (*Id.*) Plaintiff further points out that "[t]he request sought facts—not MMG's opinions about the significance of those facts." (*Id.*)

For its part, MMG contends that Plaintiff's RFA "is an inquiry that is best answered by the face of the documents themselves and expert forensic analysis, not an RFA to a party that does not carry itself as an expert in forensic IT matters or the interpretation of metadata." Finally, MMG stated that: "If the Plaintiffs or the Court prefer, MMG is will[ing] to change its denial to an assertion that following a reasonable inquiry, it lacks knowledge or information sufficient to enable to it reliably admit or deny the request."

We agree with Plaintiff that it asked a straightforward, factual question and that MMG's response is evasive. Plaintiff's RFA simply asks MMG to admit whether the IP addresses associated with the fraudulent withdrawal forms are different from those associated with legitimate withdrawal forms. (Doc. 76, Ex. 1 at 15.) The RFA does not call for Defendant to admit to any conclusions that might be drawn from the fact of whether the numbers are the same. (*Id.*) Despite the straightforward nature of Plaintiff's request, MMG's answer evaded the factual question entirely. (*Id.*) Accordingly, MMG's denial does not comport with the requirement of Rule 36(a)(4) that "a denial must fairly respond to the substance of the matter." Fed. R. Civ. P.

36(a)(4). MMG must amend its answer to address the factual question of whether the IP addresses associated with the fraudulent withdrawal forms are different from those associated with legitimate withdrawal forms.

## B. Plaintiff and Nationwide

In their correspondence to the Court, Plaintiff and Nationwide have organized their remaining disputes by "topic," with each topic containing some number of specific interrogatories or RFAs that remain in dispute. In line with this organization, this section is divided broadly by "topic" and then addresses each specific dispute in subsections.

### 1. "Nationwide's Due Diligence and Personnel Involved"[2]

This topic includes only one specific disputed interrogatory: Plaintiff's Interrogatory No. 1 of October 10, 2018. This interrogatory stated:

> With respect to each withdrawal from Mr. Leventhal's account in the LSG Plan after December 31, 2015, describe the circumstances in detail, and identify all related documents and/or electronically-stored information (hereinafter collectively, "All Documents/ESI'') by bates number, including but not limited to information such as withdrawal requests, dates, amounts, processing procedures, where the money was sent, the persons involved and roles they played, the due diligence (if any) applied to confirm the legitimacy of the requests, the extent (if any) to which the authenticity of the requester's signature was analyzed, who authorized the actions and how, and any other information relating to the processing of such withdrawals.

(Doc. 79 at 2.)

In its response, Nationwide stated:

> Nationwide objects to this Interrogatory to the extent that it is not reasonably calculated to lead to the discovery of admissible evidence as it seeks information that is irrelevant to any plausible claims asserted by Plaintiffs. Nationwide also objects to this Interrogatory as overly broad and unduly burdensome. Notwithstanding these objections, Nationwide directs Plaintiffs to its contemporaneous document production in response to Plaintiffs' Document Requests and its responses to Plaintiffs' other Interrogatories . . . .

---

[2] (Doc. 79 at 2.)

(*Id.*) Nationwide proceeded to describe the circumstances of its receipt of the withdrawal requests. Notably, Nationwide stated that, after it received withdrawal requests from MMG, "Nationwide then processed the withdrawal in accordance with its standard operating procedures for participant distributions. *See* Response to Interrogatory No. 2." (*Id.*) Nationwide's Response to Interrogatory No. 2 references a document entitled "Nationwide Retirement Plans, Private Sector: Standard Participant Distributions, Standard Operating Procedure ("Standard Operating Procedures"). (Doc. 31, Ex. 3 at 5.) Nationwide's Response to Interrogatory No. 2 states that the procedures contained in the Standard Operating Procedures "were followed in connection with all of [Plaintiff's] withdrawal requests." (*Id.*) Nationwide further references a specific page in the Standard Operating Procedures containing "details regarding the formulation of the standard operating procedures." (*Id.*)

Plaintiff argues that "the [Standard Operating Procedures] is cryptic and unhelpful." (Doc. 78 at 2.) Plaintiff asserts that it does "not answer the interrogatory at all relative to the due diligence Nationwide applied to confirm the legitimacy of the requests, the extent to which the authenticity of signature was analyzed, who authorized the actions and how, nor did it identify the persons involved in the specific transactions." (*Id.*)

Nationwide contends that its identification of the Standard Operating Procedures document "fully and accurately answered Plaintiff's interrogatory" in that it contains the "protocols that were followed in connection with [Plaintiff's] withdrawal requests." (Doc. 79 at 3.) Nationwide also contends that it "specifically identified a quality control checklist form that was part of the Standard Operating Procedure and directed Plaintiffs to the completed checklists for the fraudulent withdrawals." (*Id.* at 3–4.)

First, we note that the parties have stated that the only remaining disputes related to Interrogatory No. 1 concern Nationwide's answer regarding its "due diligence" in verifying the legitimacy of the withdrawal requests and the individuals involved in doing so. (Doc. 78 at 2; Doc. 79 at 4.) Further, we are not persuaded by Nationwide's objections as to the relevance or breadth of Plaintiff's questions regarding due diligence and the individuals involved in the fraudulent withdrawal. We therefore address whether Nationwide's response is sufficient and find that it is not.

Upon review of the Standard Operating Procedures, we find that Nationwide's reference to that document is an insufficient answer to Plaintiff's interrogatory. The Standard Operating Procedures is forty-six pages long, and it does not contain any particulars of the withdrawals at issue in this case. *See generally*, Doc. 75, Ex. 1. Within those forty-six pages, Nationwide's only effort to narrow the range of relevant information was to reference one specific page that contains "details regarding the formulation of the standard operating procedures." While that page does contain a checklist of security measures that apply to withdrawals, it does not make clear whether those measures were applied to the fraudulent withdrawals at issue in this case. (Doc. 75, Ex. 1 at 45.) Further, nowhere in the document are the names of any individuals involved in the fraudulent withdrawal at issue in this case.

Nationwide stated that it has already directed Plaintiff "to the completed checklist for the fraudulent withdrawals." (Doc. 79 at 3–4.) However, its answer referenced only one checklist, and it is not clear whether that checklist includes all of the protocols in place regarding the withdrawals in question. Further, Nationwide has not disclosed the names of the individuals involved in processing the withdrawals. Accordingly, Nationwide must amend its answer to Interrogatory No. 1 to identify the specific procedures applied to confirm the legitimacy of the

relevant withdrawal requests, as well as to identify the individuals involved in doing so. If Nationwide wishes to respond by reference to the checklist in its Standard Operating Procedures, it may do so, but it must state with specificity whether the checklist was followed precisely in each of the four fraudulent withdrawals and, if not, how they differed.

### 2. "The Security Protocols Defendants Applied to Protect Their Own Money"[3]

This "topic" includes three separate disputes: Plaintiff's Interrogatory No. 4 of October 10, 2018; Plaintiff's RFA No. 26; and Plaintiff's RFA No. 27. Accordingly, this section is divided into three subsections to address each discrete dispute.

#### a. Interrogatory No. 4

Plaintiff's Interrogatory No. 4 to Nationwide stated:

> Describe the security protocols associated with your own banking and investment accounts, including but not limited to matters such as password protection, oral approvals, verification of signature authenticity, contemporaneous confirmation notices, restricting wires to previously client approved receiving banks, and whether any of your own such accounts allow for withdrawal by email.

(Doc. 79 at 5.)

Nationwide's response stated:

> Nationwide objects to this Interrogatory to the extent that it is not reasonably calculated to lead to the discovery of admissible evidence as it seeks information that is irrelevant to any plausible claims asserted by Plaintiffs. Nationwide also objects to this Interrogatory as overly broad and unduly burdensome. Additionally, Nationwide objects to the phrase "your own banking and investment accounts" as vague and ambiguous.

(*Id.*)

Plaintiff argues that its interrogatory seeks relevant information to the extent that Nationwide is a trustee and "the law is clear that a trustee may be found liable if it does not apply the same precautions in caring for another's property as it does for its own property." (Doc. 78 at

---

[3] (Doc. 79 at 5.)

3.) Plaintiff argues that: "[T]he protections that Defendants applied to safeguard their own money are relevant in evaluating whether Defendants adequately protected the Plaintiffs' money in light of industry customs and standards as well as their own individualized expertise." (*Id.*)

Nationwide first argues that information regarding its protection of its own money is irrelevant in that Nationwide is, in fact, not a trustee of Plaintiff's account. (Doc. 79 at 6.) Further, Nationwide argues that, even if it would be considered a fiduciary, the information is still irrelevant because fiduciaries in this context are held to an objective standard, and the information Plaintiff seeks would reflect only on "Nationwide's subjective preferences." (*Id.*)

We find that Plaintiff's request seeks relevant information that is fairly within the scope of discovery, but that the request contains language that is overly broad and must be narrowed. We agree with Plaintiff that the security protocols Nationwide applied to its own accounts is within the scope of discovery. However, we also agree with Nationwide's objection that Plaintiff's phrase "your own banking and investment accounts" is overly broad. Therefore, Plaintiff must amend its interrogatory to clarify the accounts about which it seeks the information. Nationwide must then respond to the substance of Plaintiff's amended interrogatory to the extent that it relates to the protocols followed for transactions analogous to the ones at issue in this case, *i.e.*, transactions that involve withdrawals that are distributed to a third party.[4]

### b.  RFA No. 26

Plaintiff's RFA No. 26 to Nationwide stated: "Admit that the 401(k) accounts that Nationwide offered its own employees in 2016 were safeguarded by anti-fraud measures such as User IDs, passwords and/or verified bank accounts." (Doc. 79 at 5.) Nationwide's response stated: "Nationwide objects to this Interrogatory to the extent that it is not reasonably calculated

---

[4] We fully expect that the parties will meet and confer and engage cooperatively so as to enable Plaintiff to obtain information regarding the security protocols Nationwide utilized for transactions during the relevant time period that were analogous to the four fraudulent withdrawals in this case.

to lead to the discovery of admissible evidence because it seeks information that is irrelevant to any plausible claims asserted by Plaintiffs against Nationwide."

As discussed above, we find that the security protocols Nationwide applied to "the 401(k) accounts [it] offered its own employees" is relevant and within the scope of discovery. However, we similarly find that this request is overly broad. Plaintiff must narrow its request to focus only on transactions analogous to the ones at issue in this case, and Nationwide must respond substantively to the extent Plaintiff does so.

### c.   RFA No. 27

Plaintiff's RFA No. 27 states: "Admit that Nationwide did not implement any of the foregoing anti-fraud measures in connection with its processing of the Four Fraudulent Withdrawal Forms." Nationwide's response states: "Nationwide objects to this Interrogatory to the extent that it is not reasonably calculated to lead to the discovery of admissible evidence because it seeks information that is irrelevant to any plausible claims asserted by Plaintiffs against Nationwide."

We find that whether Nationwide implemented anti-fraud measures in connection with the fraudulent withdrawals *at issue in this case* is clearly relevant and within the scope of discovery. Nationwide must respond to this RFA.

### 3.   "Nationwide's Requirement of an 'Original Signature'"[5]

This topic includes only one specific disputed interrogatory: Plaintiff's Interrogatory No. 1 of February 5, 2019. This interrogatory stated:

> Identify all circumstances in which Nationwide requires an "Original Signature" (as defined by the Program Agreement), state whether or not such an Original Signature was required in connection with the four withdrawal forms drawing on Mr. Leventhal's account dated on or about April 6, 2016 (for $60,000), April 19, 2016 (for $100,000), April 26, 2016 (for $200,000), and May 13, 2016 (for

---

[5] (Doc. 79 at 7.)

$48,650) (hereinafter collectively, the "Four Fraudulent Withdrawal Forms"), and, if not, explain why not.

(Doc. 79 at 7.)

In response, Nationwide objected to the relevance of the inquiry, then went on to state:

Nationwide directs Plaintiffs to the previously produced Nationwide Program Agreement, which outlines the circumstances in which Nationwide requires a "Signature" or "Original Signature," and [the Standard Operating Procedures], which outlines Nationwide's standard operating procedure for verifying authorized signatures. Nationwide further states that the Nationwide Program Agreement and the Standard Operating Procedures were followed with regards to the four withdrawals described by Plaintiffs above.

(*Id.*) (citations omitted).

Plaintiff argues that Nationwide's reference to the Program Agreement is inadequate, as that document "afford[s] Nationwide discretionary latitude" to determine whether a signature's format is acceptable. Specifically, Plaintiff contends that the Program Agreement does not identify "where [Nationwide] required original signatures in the exercise of its discretion." Plaintiff also points out that Nationwide has previously provided clarification on this point in its April 10, 2019 brief (Doc. 33 at 9–10) and requests that Nationwide amend its interrogatory answer to reflect that clarification.

Nationwide argues that its reference to the Program Agreement and Standard Operating Procedures is sufficient in that the interrogatory "sought information that was contained in documents produced by Nationwide" and that the documents "spoke better for themselves." (Doc. 79 at 7.) Further, Nationwide stated that, "as part of a meet and confer, . . . Nationwide specifically reviewed the [Program Agreement] to identify all of the (irrelevant) instances where an "Original Signature was required." (*Id.*) (parenthetical in original). Accordingly, Nationwide argues that it "cannot do anything more to answer this interrogatory." (*Id.*)

13

First, we note that the application of Nationwide's policies regarding security measures for withdrawals is relevant and within the scope of discovery in this case. Further, upon review of the Program Agreement, we agree with Plaintiff's assessment that that document does not make clear all the circumstances in which an "Original Signature" was required. (Doc. 31, Ex. 6 at 16.) Further, Nationwide has apparently already "reviewed the Program Agreement to identify all of the instances where an Original Signature was required." (Doc. 79 at 8.) Moreover, Plaintiff is correct that Nationwide has previously represented in a prior filing that there is only one instance in which an Original Signature is required. (Doc. 33 at 9–10.) Accordingly, Nationwide must amend its response to make clear the circumstances in which an "Original Signature" was required.

### 4.  "The Alleged Hacking of Ms. Selinsky's Computer"[6]

This topic includes only one specific disputed interrogatory: Plaintiff's Interrogatory No. 3 of February 5, 2019. This interrogatory stated:

> State whether or not Defendants contend that Ms. Selinsky's email account was or was not hacked, and, if so, all factual bases relating to that contention. Also, state when and how Defendants first learned about any such hacking, or even the possibility of such a hacking; identify by bates number any related documents, and describe any and all steps you took, or recommended that Plaintiffs or anyone else take, by way of precautionary safeguards if and when you learned about any such possible hacking; and state whether or not you took or recommended any prophylactic steps, after learning about the possibility of a hacking, to ensure the authenticity of your subsequent email communications involving Ms. Selinsky's email account.

(Doc. 79 at 9.)

Nationwide's response stated:

> Nationwide objects to this Interrogatory to the extent that it is not reasonably calculated to lead to the discovery of admissible evidence because it seeks information that is irrelevant to any plausible claims asserted by Plaintiffs against Nationwide. Subject to and notwithstanding these objections, Nationwide states

---

[6] (Doc. 79 at 9.)

that it lacks knowledge to state with any certainty whether or not Ms. Selinsky's email account was hacked. Therefore, it presently makes no contention regarding that issue other than as alleged or admitted by Plaintiffs. Answering further, Nationwide states that, based on its present investigation, it appears that the first indication that it received regarding "the possibility of such a hacking" of Ms. Selinsky's email account occurred in June 2016, when Ms. Selinsky indicated to Shane Pappas that her e-mail account was hacked (see NW000006). Nationwide objects to all further subparts of this interrogatory as unrelated and irrelevant to the transactions at issue or to any alleged or plausible claim in Plaintiffs' complaint.

(*Id.*)

The subject of the parties' dispute with regard to this interrogatory is their disagreement "as to whether Plaintiff's inquiry related to precautionary steps taken by Nationwide in response to the hacking is within the scope of permissible discovery under Fed. R. Civ. P. 26(b)(1)." (Doc. 79 at 10.) Plaintiff argues that such information is within the scope of discovery in that it is relevant to defenses Plaintiff may wish to assert against Nationwide's counterclaims alleging that Plaintiff acted negligently relative to the alleged hacking. (Doc. 78 at 7.) Plaintiff also argues that this information is not evidence of "subsequent remedial measures" that would be barred pursuant to Federal Rule of Evidence 407 in that Plaintiff is "not seeking the evidence to establish that Nationwide acted negligently . . . [but to] support their defense regarding the reasonableness of their own conduct." (*Id.* at n.7.)

Nationwide argues that information regarding "any prophylactic steps [it took] after learning about the possibility of a hacking is irrelevant and outside the scope of discovery. (Doc. 79 at 10.) Nationwide contends that its actions are irrelevant in that Nationwide did not learn of a possible hacking until after the withdrawals at issue in this case were completed. (Doc. 33 at 12.) Accordingly, Nationwide argues that its "actions in light of this subsequent knowledge is irrelevant because Plaintiffs' claims are limited to the four subject withdrawals alone."

We find that information regarding any prophylactic steps Nationwide took in response to its gaining knowledge of a possible hacking is relevant and within the scope of discovery. As Plaintiff explained, this information may be relevant to the reasonableness of its own conduct in responding to the possible hacking of Ms. Selinsky's computer. While we agree with Nationwide that any steps it did or did not take after learning of the possible hacking is not relevant as to its own liability, we disagree to the extent Nationwide argues that it is irrelevant to any possible claims or defenses in this case. Accordingly, Nationwide must amend its answer to address what, if any, prophylactic measures it implemented as a result of its knowledge of the possible hacking.

## IV. CONCLUSION

"Relevance under Rule 26(b)(1) is construed more broadly for discovery than for trial." *Pepsi-Cola Metro. Bottling Co. v. Ins. Co. of N. Am.*, 2011 WL 239655, at *2 (E.D. Pa. Jan. 25, 2011). "Discovery requests may be deemed relevant if there is any possibility that the information may be relevant to the general subject matter of the action." *CedarCrestone Inc. v. Affiliated Computer Servs. LLC*, 2014 WL 3055355, at *4 (M.D. Pa. July 3, 2014) (quoting *Foster v. Berwind Corp.*, 1990 WL 209288, *6 (E.D. Pa. Dec.12, 1990)). We find that the information Plaintiff seeks through its motion to compel is relevant, within the broad scope of discovery, and satisfies the liberal discovery standards applied in the Third Circuit. Our order follows.